UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRIME HEALTHCARE SERVICES - MONTCLAIR, LLC, d/b/a Montclair Hospital Medical Center,<br><br>    Plaintiff,<br><br>    v.<br><br>ERIC D. HARGAN, in his official capacity as Acting Secretary of the U.S. Department of Health and Human Services,<br><br>    Defendant. | No. CV 17-659 PA (JCx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Plaintiff Prime Healthcare Services - Montclair LLC ("Plaintiff"), which owns and operates Montclair Hospital Medical Center, brought this action pursuant to the Administrative Procedure Act ("APA"), 42 U.S.C. § 1395ff(b)(1)(A) (incorporating the judicial review procedure of 42 U.S.C. § 405(g)). Plaintiff seeks judicial review of a final decision by Eric D. Hargan in his official capacity as Acting Secretary of the U.S. Department of Health and Human Services ("Secretary" or "Defendant")[1/] that Plaintiff

---

[1/]    By operation of Federal Rule of Civil Procedure 25(d), Eric D. Hargan is automatically substituted into this action as the defendant in place of Thomas E. Price.

received an overpayment of $5,412.98 under Medicare for inpatient medical services that were not reasonable and necessary.

Following the filing, review, and consideration of the Administrative Record ("AR," Docket No. 32), the parties' Opening and Responsive Trial Briefs, the submission of their respective Proposed Findings of Fact and Conclusions of Law, and their objections to each other's Proposed Findings of Fact and Conclusions of Law, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

**I.	FINDINGS OF FACT**

    **A.	Statutory and Regulatory Background**

        1.	Medicare is a federally funded health insurance program for the elderly and disabled. See 42 U.S.C. § 1395, et seq. Medicare coverage is limited to services that are medically "reasonable and necessary." See Palomar Med. Ctr. v. Sebelius, 693 F.3d 1151, 1155 (9th Cir. 2012) (citing 42 U.S.C. § 1395y(a)(1)(A)). Absent a national or local coverage determination, the regional Medicare Administrative Contractor responsible for administering benefits claims generally determines whether a claim is medically reasonable and necessary. See Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations, 68 Fed. Reg. 63692, 63693 (Nov. 7, 2003).

        2.	Medicare service providers submit claims for reimbursement for covered services, and Medicare Administrative Contractors make initial determinations of coverage and amount. See Palomar Med. Ctr., 693 F.3d at 1154-55 (citing 42 U.S.C. § 1395ff(a); 42 C.F.R. § 405.920). In exercising their regulatory functions, contractors conduct post-payment audits to ensure that payments are made in accordance with applicable Medicare payment criteria. When audited, a Medicare provider seeking payment must provide sufficient evidence to establish the medical reasonableness and necessity of the services billed to Medicare. See 42 U.S.C. §§ 1395g(a), 1395l(e), 1395gg.

3.      Initial determinations are appealable through a four-step administrative process. First, if the claimant is dissatisfied with the initial determination, it may request that the same contractor conduct a "redetermination." 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940. Second, if the claimant is dissatisfied with the contractor's redetermination, it may request a "reconsideration" by a "qualified independent contractor." 42 U.S.C. § 1395ff(b)(1)(A), (c)(1)-(2); 42 C.F.R. § 405.960. Third, a still-dissatisfied claimant may request a hearing before an administrative law judge ("ALJ"). 42 U.S.C. § 1395ff(b)(1)(A), (b)(1)(E), (d)(1); 42 C.F.R. § 405.1002. Finally, the claimant may seek review of the ALJ's decision by the Medicare Appeals Council, Departmental Appeals Board. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1100.

4.      Once this administrative process is exhausted, the claimant may then seek judicial review, as provided in 42 U.S.C. § 405(g), of the final agency decision of the ALJ or the Medicare Appeals Council, as applicable. 42 U.S.C. § 1395ff(b)(2)(C); 42 C.F.R. § 405.1136.

5.      The Medicare Act provides for a process called "escalation," whereby a service provider can bypass steps in the administrative appeals process if a decision is not issued within the statutorily set time period. If, for instance, the Medicare Appeals Council does not issue a determination within 90 days, a service provider may seek judicial review in federal court. 42 U.S.C. § 1395ff(d)(3); 42 C.F.R. § 405.1132.

6.      The Medicare Act provides that "no payment may be made under Part A or Part B . . . for any expenses incurred for items or services . . . which. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). Medicare Part A covers "inpatient hospital services" and Medicare Part B covers outpatient services, including hospital outpatient services for patients that do not require a hospital admission. 42 U.S.C. §§ 1395c, 1395d(a)(l), 1395j, 1395k.

7.      Congress has vested final authority in the Secretary to determine what items or services are "reasonable and necessary." 42 U.S.C. § 1395ff(a); Heckler v. Ringer, 466 U.S.

602, 617, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984) (citing 42 U.S.C. § 1395ff(a)). Congress also has vested discretion in the Secretary to determine what information to require as a condition of payment. See Maximum Comfort, Inc. v. Sec'y of Health & Human Servs., 512 F.3d 1081, 1088 (9th Cir. 2007); Cmty. Hosp. of Monterey Peninsula v. Thompson, 323 F.3d 782, 789 (9th Cir. 2003) (citing 42 U.S.C. § 1395gg(a)). Consistent with this authority, the Secretary has promulgated policies and regulations relating to the "reasonable and necessary" requirement, placing the burden of establishing the reasonableness and necessity of medical care on the claimant. 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6).

8. The statutory provisions governing Medicare Part A do not define the term "inpatient." See 42 U.S.C. §§ 1395d(a), 1395x(b), 1395x(i). However, through the Centers for Medicare & Medicaid Services ("CMS"), the Secretary defined "inpatient" in the CMS Medicare Benefits Policy Manual in effect at the time of the claim at issue as

> a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services. Generally, a patient is considered an inpatient if formally admitted as inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight.

CMS, Dep't of Health & Human Servs., Publ'n No. 100-02, Medicare Benefits Policy Manual ch. 1, § 10 [hereinafter "Policy Manual"]; see Barrows v. Burwell, 777 F.3d 106, 108 & n.5 (2d Cir. 2015). The Policy Manual stated that when deciding whether to admit a patient, "[p]hysicians should use a 24 hour period as a benchmark, i.e., they should order admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis." Policy Manual ch. 1, § 10. The Policy Manual listed "a number of factors" that a physician should consider, "including the patient's medical history and current medical needs, the types of facilities available to inpatients and outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness

-4-

of treatment in each setting." Id. The Policy Manual also provided that whether the admission is covered or noncovered is not to be based solely on the length of time the patient actually spends in the hospital. Id.

9. As an alternative to admitting an individual as an inpatient, a hospital may place the patient on "observation status," in which case the services he or she receives will be considered outpatient "observation services." The Policy Manual defined "outpatient observation services" as "a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." Policy Manual ch. 6, § 20.6(A). Thus, "[o]bservation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge." Id. § 20.6(A); see id. § 20.6(B). "In the majority of cases, the decision whether to discharge a patient from the hospital following resolution of the reason for the observation care or to admit the patient as an inpatient can be made in less than 48 hours, usually in less than 24 hours." Id. § 20.6(A).

10. Because patients on observation status are not yet "inpatients," the services they receive are covered under Part B as outpatient services. See Policy Manual ch. 6 § 20.6(B). This distinction is significant because coverage of outpatient services under Part B is usually reimbursed at a lower rate than the same services billed as inpatient services under Part A. See Alexander v. Cochran, No. 3:11-cv-1703 (MPS), 2017 WL 522944, at *1 (D. Conn. Feb. 8, 2017).

**B. Services Provided to B.N. and the Overpayment Determination**

11. At approximately 11:46 p.m. on October 28, 2011, B.N., a 90-year-old woman, presented at the Montclair Hospital Medical Center emergency department complaining of having fallen down in a nursing home. (AR 274, 279.) The provoking factor was listed as "Trip/Fall" (AR 274), and the mechanism of injury was described as a mechanical slip and

fall (AR 280). B.N. reported that she fell "because she did not have her walker when she went to the bathroom." (AR 282.)

12. B.N. had a left parietal scalp laceration of about one inch and a moderate amount of bleeding. (AR 274-75.) She did not lose consciousness, and she was able to have a conversation on arrival at the emergency department. (AR 274.) She had no other significant injuries. (Id.) She had no numbness, no paresthesias, no weakness, and no foreign body sensation. (Id.) She was in no apparent or acute distress. (AR 275, 282, 286.) Her head, eye, ear, nose, and throat (together, "HEENT") as well as her neck, chest, heart, abdomen, genitourinary system, back, and extremities were unremarkable. (AR 275.) She did not complain of chest pain. (AR 275, 281.) Her respiratory and neurological assessments were within normal limits. (AR 275-76, 281.) Her heart was beating at a regular rate and rhythm without any murmur, click, or rub. (AR 275.) B.N.'s past medical history included dementia and hypertension but no cardiac disorders or diabetes. (AR 274.)

13. The emergency department physician, Dr. Isidore Kwaw, examined B.N. and documented that B.N. had not lost consciousness, could speak, had normal vital signs, was not in acute distress, and had no other significant findings from a physical examination other than the scalp laceration. (AR 275-78.) Dr. Kwaw diagnosed "S/P fall with 1" left parietal scalp laceration." (AR 278.) Dr. Kwaw had the scalp laceration repaired with eight sutures, which B.N. tolerated well, and ordered tests. (AR 276-78.) A CT scan of B.N.'s head was negative. (AR 276.) X-rays of the chest and pelvis showed no acute disease or injury. (AR 278.) An electrocardiogram was normal, showing normal sinus rhythm and no significant abnormalities. (Id.) However, B.N. had a slightly elevated level of troponin (0.07 ng/mL), a protein that is released when the heart is damaged. (AR 276-78, 292, 321.)

14. At 2:25 a.m. on October 29, 2011, less than three hours after arriving at the emergency department, B.N. was admitted as an inpatient to the telemetry unit for heart monitoring. (AR 258, 278, 365, 694.) Dr. Kwaw documented that B.N. was "admitted for observation and pain control." (AR 276, 278.) The admitting diagnosis was "mechanical fall/injury – rt forehead." (AR 365; see AR 300.)

15. The admitting and attending physician was Dr. Tuan Le. (AR 258, 365.) A note by Dr. Le at 2:25 a.m. on October 29, 2011, stated that the diagnosis was a "mechanical fall/injury," that B.N.'s vital signs were routine, and that B.N. was prescribed an IV and continued wound care. (AR 300.) Elsewhere, Dr. Le documented that B.N. met the Milliman inpatient admission criteria for a fall injury for elderly patients based on the need for "[f]urther evaluation of cause of fall" and the "extent of injury." (AR 290.) Dr. Le's assessment and plan were as follows: "Status post mechanical fall with one inch left parietal scalp laceration, status post repair. We will continue to monitor the patient with telemetry. Possible syncope. We will continue monitoring and PT/OT in the morning. Dehydration. Continue IV fluids." (AR 292.)

16. Following her inpatient admission, B.N. was "treated with IV fluids for her dehydration and continued to do well." (AR 411.) B.N. received telemetry monitoring, a bilateral carotid duplex ultrasound that showed plaque in the carotid arteries, and chest and pelvic x-rays that were normal. (AR 292-95, 323-25.) Laboratory studies were also performed, including serial troponins. (AR 291-326.) After a second elevated troponin reading, Dr. Le ordered a cardiology consultation "for further evaluation of any possibility of coronary artery disease." (AR 294-95, 321, 343.)

17. B.N. was seen by a cardiologist, Dr. Warren Fan, who ruled out acute coronary syndrome. (AR 411.) Dr. Fan found that there "[did] not seem to be any significant coronary artery disease" but stated that "certainly a repeat cardiac enzyme study will be obtained." (AR 294-95.) Dr. Fan also wrote that "[c]ontinuous cardiac monitoring [was] suggested, and he ordered a repeat EKG, troponin tests, and an echocardiogram. (AR 295.)

18. On October 30, 2011, at 12:20 p.m., a discharge order was given, and B.N. was discharged at 3:50 p.m. (AR 343.) The discharge came after Dr. Le ruled out acute coronary syndrome, including a heart attack, as a cause of B.N.'s fall. (AR 260, 343.) Dr. Le's discharge diagnoses included open wound of the face without complication of the forehead, malignant hypertension, hyposmolality and/or hyponatremia, dementia, open wound without complication of the forearm, syncope, and collapse. (AR 260.)

19. Following a post-payment review, on or around April 27, 2012, a Medicare contractor informed Plaintiff that the inpatient medical services provided during B.N.'s hospitalization were not medically reasonable and necessary and could have been provided as outpatient services in the hospital. (AR 672-75.)

20. Plaintiff was found to have received an overpayment of $5,412.98 in connection with B.N.'s hospitalization. (AR 527.)

21. Plaintiff unsuccessfully appealed the overpayment decision through multiple levels of administrative appeals. First, the Medicare contractor denied Plaintiff's request for redetermination on or around August 9, 2012. (AR 254-57.)

22. Second, a qualified independent contractor denied Plaintiff's request for reconsideration on or around December 4, 2012. (AR 195-99.)

**C.    The Administrative Law Judge's Decision**

23. Third, Plaintiff appealed the overpayment decision to an ALJ, enclosing with its appeal a report from Hassan Alkhouli, M.D., and various exhibits. (AR 150-94.)

24. On February 12, 2016, United States Administrative Law Judge Richard S. Bush conducted a telephonic hearing on Plaintiff's administrative appeal. (AR 683-709.) Plaintiff proffered expert witness testimony from Dr. Alkhouli, who opined that B.N.'s admission as an inpatient was medically necessary based on her age, the need to monitor for possible syncope, and the need to rule out a non-ST myocardial infarction given B.N.'s abnormal laboratory tests, including troponin levels possibly indicative of a heart attack. (AR 685, 690-707.) He also stated that "[s]ometimes transient [heart] arrythmia can have actual brief dizziness or loss of balance," and the proper course for an elderly patient "with syncope or near syncope or fall" is to monitor the patient in an inpatient setting. (AR 694.)

25. On or around February 29, 2016, the ALJ issued a written decision affirming the overpayment determination. (AR 37-44.) The ALJ rejected Plaintiff's argument that inpatient admission was medically reasonable and necessary based on B.N.'s signs, symptoms, and medical condition. (AR 42-43.) The ALJ found that B.N.'s "need for extensive diagnostic tests was low, and her co-morbid conditions of hypertension and

dementia did not require complex medical management." (AR 43.) The ALJ explained that B.N.'s "hospital stay was uneventful, and she remained stable without any complications." (Id.) The ALJ noted that B.N. received a cardiology consultation during her hospital stay, but he found that B.N. was "at low risk for an adverse event because she had no history of any heart disease." (Id.)

26. The ALJ then found that Plaintiff was not eligible for a waiver of liability under Section 1879 of the Social Security Act because Plaintiff was "presumed to have knowledge of published Medicare rules, regulations, and guidelines." (AR 43.)

27. On or around April 29, 2016, Plaintiff sought review of the ALJ decision by the Medicare Appeals Council. (AR 20-36.)

28. On or around November 29, 2016, Plaintiff requested that, because more than 180 days had passed with no decision from the Council, its appeal be escalated to federal district court or a decision be rendered within five calendar days. (AR 4-8.)

29. On or around January 13, 2017, the Council informed Plaintiff that, because it was unable to issue a decision, dismissal, or remand order within five calendar days of Plaintiff's request, Plaintiff could bypass the Council and seek review of the ALJ's decision in federal district court. (AR 1-3.)

30. On January 27, 2017, Plaintiff filed its original complaint in this action, seeking judicial review of the Secretary's final decision. (Docket No. 1.)

31. On June 29, 2017, Plaintiff filed a Second Amended Complaint, which is the operative complaint. (Docket No. 29.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

1. Where, as here, the Medicare Appeals Council does not review the ALJ's decision, the ALJ's opinion stands as the final decision of the Secretary. Judicial review of such final decisions lies with this Court pursuant to 42 U.S.C. § 1395ff(b)(1)(A), which incorporates 42 U.S.C. § 405(g) and allows for judicial review of a final decision of the Secretary with respect to Medicare benefits. "The findings of the Secretary as to any fact, if

supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (incorporated into 42 U.S.C. § 1395ff(b)(1)(A)).

2. Judicial review of the Secretary's factual findings must be based solely on the administrative record and is limited to determining whether: (1) the record contains substantial evidence to support the ALJ's findings; and (2) the correct legal standards were applied. 42 U.S.C. §§ 1395ff(b), 1395w-22(g)(5); Mayes v. Massanari, 276 F.3d 453, 458-59 (9th Cir. 2001).

3. "The substantial evidence standard is extremely deferential to the factfinder . . . ." Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 149, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997). "Substantial evidence" is "more than a mere scintilla but less than a preponderance. [It] is that which a reasonable mind might accept as adequate to support a conclusion." NLRB v. Int'l Bhd. of Elec. Workers, Local 48, 345 F.3d 1049, 1054 (9th Cir. 2003) (quoting Mayes, 276 F.3d at 459) (internal quotation marks omitted). Under the substantial evidence standard, an agency's fact-based conclusion must be sustained unless no reasonable factfinder could have reached that conclusion based on the record. See INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S. Ct. 812, 117 L. Ed. 2d 38 (1992). A reviewing court must uphold the agency's findings "unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." Singh-Kaur v. INS, 183 F.3d 1147, 1149-50 (9th Cir. 1999).

4. In reviewing the administrative record, courts must review the record as a whole, taking into account both the evidence that supports the agency's findings and the evidence that detracts from them. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S. Ct. 456, 95 L. Ed. 456 (1951); see De Gorter v. FTC, 244 F.2d 270, 272 (9th Cir. 1957). The reviewing court may not substitute its judgment for that of the agency. See U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7, 122 S. Ct. 431, 151 L. Ed. 2d 323 (2001); Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1132 (9th Cir. 2011).

**B. Substantial Evidence Supports the Secretary's Decision and the Correct Legal Standards Were Applied**

5. The burden of establishing the reasonableness and necessity of medical care rests squarely with the entity submitting the claim. 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6); see also Int'l Rehab. Scis., Inc. v. Sebelius, 688 F.3d 994, 997 (9th Cir. 2012) ("The burden is on the claimant to show that the [billed medical service] is reasonable and necessary."). CMS has explained that "a treating physician controls the documentation supporting his or her opinion as to appropriate treatment." See Weight to Be Given to a Treating Physician's Opinion in Determining Medicare Coverage of Inpatient Care in a Hospital or Skilled Nursing Facility, Ruling No. 93-1, at 10-12 (Health Care Fin. Admin., Dep't of Health & Human Servs. May 18, 1993) [hereinafter "HCFA Ruling 93-1"], available at https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Rulings-Issued-Prior-to-1995-Items/HCFAR931v508pdf.html?DLPage=1&DLEntries=10&DLSort=0&DLSortDir=descending (last visited Jan. 5, 2018). In creating the medical assessment, medical history, and discharge notes, "the physician has ample opportunity to explain in detail why the course of treatment was appropriate" for the patient's condition. Id. "In addition, the physician has the opportunity to describe and explain aspects of the patient's medical history that may not otherwise be apparent. Thus, the physician is responsible for ensuring that the patient's record includes complete medical information, and this information is the basis for determining the appropriateness of the prescribed treatment." Id.

6. Plaintiff has failed to meet this burden.

7. The administrative record contained substantial evidence that the challenged inpatient admission was not medically necessary, including but not limited to the following: Although B.N. had a left parietal scalp laceration and moderate bleeding, she did not lose consciousness, and she was able to have a conversation on arrival at the emergency department. (AR 274-75.) She had no other significant injuries. (AR 274.) She had no numbness, paresthesias, weakness or foreign body sensation. (Id.) She was in no apparent

or acute distress.  (AR 275, 282, 286.)  Her HEENT, neck, chest, heart, abdomen, genitourinary, back, and extremities were unremarkable.  (AR 275.)  She did not complain of chest pain.  (AR 275, 281.)  Her respiratory and neurological assessments were within normal limits.  (AR 275-76, 281.)  Her heart was beating at a regular rate and rhythm without any murmur, click, or rub.  (AR 275.)  She had no history of cardiac disorders or diabetes.  (AR 274.)  B.N. tolerated the sutures to close her scalp laceration well.  (AR 276.)  A CT scan of her head was negative.  (Id.)  An EKG showed normal sinus rhythm with no significant abnormalities.  (AR 278.)  X-rays of her chest and pelvis showed no acute disease or injury.  (Id.)

8. The ALJ did not err in determining that B.N.'s admission was not medically reasonable and necessary despite the opinions of Dr. Kwaw, Dr. Le, and Dr. Alkouli. Plaintiff argues that inpatient admission was necessary due to B.N.'s advanced age, history of hypertension and dementia, abnormal laboratory tests, and the need to guard against life-threatening conditions relating to a syncopal or near syncopal episode.  (Pl.'s Opening Br. at 16-17, Docket No. 47.)  But there is no documentation in the record that B.N.'s age or hypertension played a role in Dr. Le's decision to admit B.N. as an inpatient.  Indeed, Dr. Le's "assessment and plan" did not mention B.N.'s age or hypertension at all.  (AR 292.)

9. Nor is there any indication in the record that the treating physicians were concerned with B.N.'s laboratory results at the time of admission, or that those results contributed to the admission decision.  B.N.'s laboratory results were simply provided in a long list, and neither Dr. Kwaw nor Dr. Le specifically referenced them in their charts or opined that they necessitated inpatient admission.  (See AR 274-78, 291-93, 300.)

10. B.N. had one elevated troponin reading of 0.07 before admission, whereas the normal range is 0.00 to 0.06.  (AR 321.)  At the hearing before the ALJ, Dr. Alkhouli testified that troponin could rise from a heart attack or from muscle injury.  (AR 699.)  But Dr. Kwaw and Dr. Le did not reference B.N.'s troponin level aside from listing it with other laboratory results, and there is no indication that either of them relied on B.N.'s troponin

level, or any other laboratory result, in admitting B.N. as an inpatient. (See AR 274-78, 291-93, 300.)

11. Substantial evidence discredits Plaintiff's suggestion that B.N.'s fall could have been caused by syncope. The medical records clearly documented that B.N. fell "because she did not have her walker when she went to the bathroom." (AR 282.) The admitting diagnosis was "mechanical fall/injury – rt forehead." (AR 365; see id. 300.) Syncope was not mentioned in Dr. Kwaw's chart (AR 274-78), Dr. Le's handwritten note at the time of admission (AR 300), or the "Notice of ER Admission" (AR 365). Indeed, despite his suggestion before the ALJ that the information at the time could have indicated a fall caused by syncope, Dr. Alkhouli testified that "[t]here was no reported syncope per se" and the attending physician had reported that "the patient had a mechanical fall." (AR 691.)

12. Dr. Le added "acute syncope" to B.N.'s "history of present illness," stating that B.N. was "admit[ted] for acute syncope with mechanical fall and head injury with lacerations and dehydration" (AR 291), and documented "[p]ossible syncope" in his "assessment and plan" (AR 292). However, Dr. Le failed to document any explanation for the findings of acute or possible syncope. The medical records therefore failed to "explain in detail" why syncope was a concern. See HCFA Ruling 93-1, at 10-11.

13. Similarly, Dr. Kwaw noted that B.N. "was admitted for observation and pain control" (AR 276) but failed to explain why this required inpatient admission rather than observation status.

14. The ALJ did not err by failing to give weight to Dr. Fan's medical opinion, as Plaintiff contends. (Pl.'s Opening Br. at 16-17.) B.N. was not referred to Dr. Fan until after she had been admitted as an inpatient. (AR 294-95, 411.) The record does not reflect that Dr. Fan was involved in the decision to admit B.N. as an inpatient or that he believed inpatient admission for B.N. was medically necessary.

15. There is insufficient evidence in the record that the admitting physician found the signs and symptoms exhibited by B.N. to be severe enough to require inpatient admission. See Policy Manual ch. 1, § 10. Furthermore, Plaintiff has not identified "any

-13-

additional necessary medical services that were not available in observation status that became available through an inpatient admission." See In re Providence Health Ctr., No. M-12-809, 2012 WL 3637361, at *5 (Medicare Appeals Council, Dep't Health & Human Servs. June 29, 2012) (upholding ALJ's decision that inpatient hospitalization was not medically necessary for 67-year-old beneficiary with a history of cardiac problems who presented with chest pains where, at the time of admission, the beneficiary's vital signs were within normal limits, he was not complaining of chest pain, cardiac enzymes did not show any acute cardiac injury, and an EKG did not show acute abnormalities).

16. Moreover, even if the admitting physician had documented risks to B.N.'s health and safety, that opinion alone would not be sufficient to justify inpatient care if it was not supported by other evidence in the record. As CMS has explained, "no presumptive weight" should be assigned to a treating physician's medical opinion in determining the medical necessity of Part A inpatient services. See HCFA Ruling 93-1, at 13. Instead, CMS states that "[a] physician's opinion will be evaluated in the context of the evidence in the complete administrative record. Even though a physician's certification is required for payment, coverage decisions are not made based solely on this certification; they are made based on objective medical information about the patient's condition and the services received." Id. In this context, a treating physician's medical opinions are entitled to no additional weight. See Maxmed Healthcare, Inc. v. Burwell, 152 F. Supp. 3d 619, 639 (W.D. Tex. 2016) ("There is no presumption that a treating physician's determination is subject to any greater weight in the Medicare context."), aff'd sub nom. Maxmed Healthcare, Inc. v. Price, 860 F.3d 335 (5th Cir. 2017); Hosp. Serv. Dist. No. 1 of Parish of Lafourche v. Thompson, 343 F. Supp. 2d 518, 523-24 (E.D. La. 2004) (noting that "there is no jurisprudential authority mandating the import of the treating physician rule in Medicare cases. . . . Ultimately, an ALJ may discount a treating physician's opinion, and assign it little or no weight, for good cause.").

17. The Court is not persuaded by Plaintiff's argument that the ALJ erred because B.N.'s admission lasted more than 24 hours. (Pl.'s Opening Br. at 16; Pl.'s Responsive Br.

at 5, Docket No. 49.) Under the Policy Manual in effect at the time of the claim, the expected length of the hospital stay at the time of admission, not the actual length of the stay that ultimately occurs, is determinative. See Policy Manual ch. 1, § 10.

18. Plaintiff does not point to any evidence in the record showing that Dr. Le or Dr. Kwaw expected that B.N. would need hospital care for 24 hours or more, or opined that B.N.'s medical condition necessitated inpatient services. This failure undermines Plaintiff's argument, and it supports the ALJ's ruling that Plaintiff failed to carry its burden of establishing medical necessity.

19. The 24-hour benchmark is just a benchmark. Consequently, the Policy Manual provides that coverage or noncoverage for an inpatient admission is not determined "solely on the basis of the length of time the patient actually spends in the hospital." Policy Manual ch. 1, § 10; see also In re R.K., No. M-12-1794, 2012 WL 4482704, at *4 (Medicare Appeals Council, Dep't Health & Human Servs. Aug. 22, 2012) ("We do not find that the length of the beneficiary's hospital stay is dispositive of whether the beneficiary required and received inpatient services.").

20. Medicare policy specifically acknowledges that outpatient observation services may last up to 48 hours, and sometimes longer. See Policy Manual ch. 6, § 20.6(A); see also Barrows, 777 F.3d at 109 ("It is possible for a patient to spend several days and nights in a hospital without ever being formally admitted; such a patient, for Medicare purposes, would be treated as an 'outpatient' and his or her care would be covered by Part B."); In re Providence Health Ctr., Waco, No. M-11-2719, 2013 WL 8744199, at *10 (Medicare Appeals Council, Dep't Health & Human Servs. June 20, 2013) ("An overnight stay for observation alone does not require an inpatient admission.").

21. Thus, the mere fact that B.N.'s stay lasted more than 24 hours does not show legal error by the ALJ. It is not substantial evidence that B.N.'s stay was expected to last at least 24 hours, or that B.N. required inpatient admission rather than observation status.

22. The Court also is not persuaded by Plaintiff's argument that the ALJ erred because the treating physician documented B.N. to have met the Milliman criteria for

-15-

inpatient admission. (Pl.'s Opening Br. at 19; Pl.'s Responsive Br. at 3; see AR 170.) First, as Plaintiff acknowledges, the Milliman criteria are not binding. (Pl.'s Responsive Br. at 3 n.3.) See In re Providence Health Ctr., No. M-11-1462, 2012 WL 3805722, at *6 n.6 (Medicare Appeals Council, Dep't Health & Human Servs. July 18, 2012) (citing 42 C.F.R. § 405.1062(a)).

23. Second, the physician circled the criteria "Further evaluation of cause of fall" and "Further evaluation of extent of injury." (AR 170 (footnotes omitted), 446 (footnotes omitted).) Both of those criteria contain a footnote stating that "[a] significant proportion of trauma service patients require less than 24 hours of care." (AR 447.) Thus, the mere presence of those criteria, without more, does not indicate that at least 24 hours of care will be required so as to justify inpatient admission. The physician did not address this footnote on the form or otherwise document whether or why he expected B.N. to fall outside the "significant proportion of trauma service patients" who require less than 24 hours of care. (AR 170, 446-47.) The physician also did not circle the criterion stating that "[t]reatment of cause of fall requires inpatient care; examples include myocardial infarction or stroke." (170 (footnote omitted), 446 (footnote omitted).) This further undermines Plaintiff's argument that inpatient admission was justified by concern that syncope had caused B.N.'s fall.

24. Third, Plaintiff's reliance on the Milliman criteria is offset by the fact that, as Plaintiff previously admitted, B.N. "did not meet the InterQual level of care criteria." (AR 31, 162; see Pl.'s Responsive Br. at 3 n.3.) Like the Milliman criteria, the InterQual criteria are not binding. See In re Providence Health Ctr., No. M-12-809, 2012 WL 3637361, at *4 n.1 (Medicare Appeals Council, Dep't Health & Human Servs. June 29, 2012) (citing 42 C.F.R. § 405.1062(a)). Nonetheless, as Plaintiff previously acknowledged, like the Milliman criteria, the "InterQual criteria for inpatient admissions are proprietary industry guidelines for acute care hospital admissions and are widely used by acute care hospitals in making inpatient admission decisions." (AR 31.) That B.N. satisfied one set of criteria for admission but not another undermines Plaintiff's argument that these nonbinding standards demonstrate legal error by the ALJ.

25. The Court also is not persuaded by Plaintiff's argument that the ALJ improperly relied on post-admission evidence that B.N. remained stable and suffered no complications during her hospital stay. (Pl.'s Opening Br. at 17-18, 19; see AR 43.) In his written decision, the ALJ first reviewed B.N.'s presentation to the emergency department, including her medical history, signs, symptoms, examination, and treatment for the scalp laceration, before stating his finding "that the beneficiary's signs/symptoms were not severe enough to warrant an inpatient admission." (AR 42.) In the following paragraph, the ALJ described the testing performed after B.N.'s admission and then noted that B.N.'s "hospital stay was uneventful, and she remained stable without any complications." (AR 43.) In the full context of the ALJ's discussion, there is no indication that the description of B.N.'s hospital stay was anything more than a recitation of fact rather than a deciding factor.

26. However, even if the ALJ's review was retrospective, an ALJ is not prohibited from considering evidence of a patient's medical condition after an admission decision has been made. See In re Tex. Health Arlington Mem'l Hosp., No. M-11-1345, 2013 WL 9555028, at *7 (Medicare Appeals Council, Dep't Health & Human Servs. Sept. 11, 2013) ("[I]t is appropriate to consider all of the medical evidence, including evidence that became available after admission. But, more importantly, the [Policy Manual], Chapter 1, Section 10 does not explicitly state that a reviewer is prohibited from considering post admission information . . . .").

27. In fact, Medicare's inpatient admission guidelines require that medical providers consider various factors, including the severity of the signs and symptoms exhibited by the patient, the medical predictability of something adverse happening to the patient, and the types of facilities and resources available to inpatients and outpatients. See Policy Manual ch. 1, § 10. According to the Medicare Appeals Council, these guidelines "contemplate that the beneficiary's condition may change following admission, which may necessitate a change in the beneficiary's status from that of an inpatient to an outpatient, or vice versa. As such, consideration of the beneficiary's condition during the course of the hospital stay would be relevant." In re Providence Health Ctr., Waco, No. M-12-1054, 2013

WL 8700046, at *7 (Medicare Appeals Council, Dep't Health & Human Servs. July 2, 2013); In re Integris Baptist Med., No. M-11-1418, 2013 WL 8633102, at *6 (Medicare Appeals Council, Dep't Health & Human Servs. June 11, 2013) (stating the same in explaining that "the ALJ's consideration of the beneficiary's condition during the hospital course is relevant in assessing the factors listed in the coverage guidelines").

28. Because substantial evidence in the administrative record supports the Secretary's conclusion that Plaintiff did not meet its burden of establishing the medical reasonableness and necessity of the inpatient services provided to B.N., and because the correct legal standards were applied, the Secretary properly found that Plaintiff received an overpayment of $5,412.98 in connection with B.N.'s hospitalization.

C. **The Secretary Correctly Determined that Plaintiff Cannot Avoid Liability for the Noncovered Services**

29. The ALJ did not err by denying Plaintiff's claim for a waiver of any overpayment under Section 1879 of the Social Security Act, 42 U.S.C. § 1395pp. (AR 43.)

30. A provider of services may receive a waiver if it "did not know, and could not reasonably have been expected to know, that payment would not be made for [the] items or services" that it furnished. 42 U.S.C. § 1395pp(a)(2). The Court "may set aside the Secretary's conclusion that [Plaintiff] is not excused from liability under § 1395pp(a)(2) if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Maximum Comfort, 512 F.3d at 1088. The Court's "review of the Secretary's decision is 'highly deferential.'" Id.

31. Plaintiff has failed to meet the standard required to reverse the ALJ's denial of a waiver. The ALJ correctly noted that Plaintiff "is presumed to have knowledge of published Medicare rules, regulations, and guidelines." (AR 43.) See 42 C.F.R. §§ 411.406(e)(1), (e)(3) (stating that a provider could have been considered to know that services were excluded from coverage on the basis of, among other things, "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from [a Medicare contractor]" or "[i]ts knowledge of what are considered acceptable

-18-

standards of practice by the local medical community"). Further, "it is not unreasonable to expect a provider to know when the medical services rendered are reasonable and necessary." Hosp. Serv. Dist. No. 1, 343 F. Supp. 2d at 529.

32. The ALJ identified the issue of and stated the correct standard for waiver. (AR 38, 40.) The "Analysis" section of the ALJ's decision discussed only whether inpatient services were medically reasonable and necessary. (AR 41-43.) However, after reiterating that inpatient services were not medically reasonable and necessary, the ALJ stated among his "Conclusions of Law" his finding "that [Plaintiff] is not eligible for a waiver of liability pursuant to Section 1879 of the Social Security Act because the Appellant is presumed to have knowledge of published Medicare rules, regulations, and guidelines." (AR 43.)

33. Consistent with the Policy Manual's guidance, the ALJ considered all factors concerning B.N.'s treatment in determining that B.N.'s inpatient admission was not covered. (AR 40-43.) For much the same reasons explained above as to why substantial evidence supports that conclusion, Plaintiff knew or reasonably should have known that B.N.'s inpatient admission would not be covered. See Hosp. Serv. Dist. No. 1, 343 F. Supp. 2d at 529; see also Prime Healthcare Servs.-Garden Grove, LLC v. Price, No. SACV 17-00169 AG (KSx), 2017 WL 6033664, at *3 (C.D. Cal. Oct. 23, 2017) (upholding ALJ's denial of waiver based on constructive knowledge of the Policy Manual's 24-hour benchmark for inpatient admissions).

34. The Court is not persuaded by Plaintiff's argument that "the record demonstrates that the Hospital had good reason to believe that the program would cover B.N.'s 35-hour hospital stay because it exceeded Medicare's 24-hour coverage benchmark for inpatient admissions." (Pl.'s Opening Br. at 21.) As discussed, the 24-hour benchmark refers to the expected length of the hospital stay at the time of admission. At the time of admission, Plaintiff did not know how long B.N. would stay. Additionally, the Policy Manual clearly provides that whether the admission is covered or noncovered is not to be based solely on the length of time the patient actually spends in the hospital. See Policy

Manual ch. 1, § 10. The actual length of B.N.'s stay therefore does not undermine the ALJ's conclusion that Plaintiff is not entitled to a waiver.

35. The "substantial evidence" standard requires the ALJ's decision to be upheld "unless the evidence presented would <u>compel</u> a reasonable finder of fact to reach a contrary result." <u>Singh-Kaur</u>, 183 F.3d at 1149-50. Plaintiff has not satisfied this highly deferential standard of review.

36. Accordingly, the Court finds in favor of the Secretary and upholds the ALJ's findings that Plaintiff was overpaid by $5,412.98 because B.N.'s inpatient admission was not medically reasonable and necessary, and that Plaintiff is not eligible for a waiver of liability pursuant to Section 1879.

**<u>Conclusion</u>**

The Secretary's decision that the inpatient care provided to B.N. was not medically reasonable and necessary and that Plaintiff was not entitled to a waiver of liability under Section 1879 of the Social Security Act are supported by substantial evidence, are not arbitrary or capricious, and are without legal error. The Court therefore upholds the Secretary's final decision. The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

DATED: January 9, 2018

Percy Anderson
UNITED STATES DISTRICT JUDGE